Defendant Below, Appellant,
v.
CITY OF MILFORD, Plaintiff Below, Appellee.
No. 247, 2009.
Supreme Court of Delaware.
Submitted: December 16, 2009.
Decided: March 11, 2010.
James D. Griffin, Esquire, of Griffin & Hackett, P.A., Georgetown, Delaware; for Appellant.
Timothy G. Willard, Esquire, of Fuqua and Yori, P.A., Georgetown, Delaware; for Appellee.
Before STEELE, BERGER, and JACOBS, Justices.
JACOBS, Justice:
Key Properties Group, LLC ("Key"), appeals from a Superior Court Final Award of Compensation Order and related orders. Those orders resolved a condemnation action, filed by the city of Milford ("Milford" or the "City"), to obtain temporary construction and permanent utility easements thorough Key's Hearthstone Manor development ("Hearthstone Manor"). Before entering the Award Order, the Superior Court denied Key's motion to dismiss the condemnation action and granted Milford an Order of Possession of the easements.
Key seeks the reversal of the Superior Court Order. Key argues that: (1) the City violated its charter when authorizing the filing of the condemnation action; (2) the condemnation violates the Public Use clauses of the Delaware and the United States Constitutions; (3) the City is equitably estopped from exercising its condemnation power against Key; and (4) the City violated the Real Property Acquisition Act ("RPAA") before filing the condemnation action. We conclude that Key's claims are without merit, and, therefore, affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. The Hearthstone Manor and West Shore Developments
In April 2000, Milford annexed Hearthstone Manor and entered into a utility agreement with Key, which is Hearthstone Manor's owner.[1] That utility agreement provided that: (i) Milford will construct and install the sewer and water utility systems up to the Hearthstone Manor property line; (ii) Key will install those systems in Hearthstone Manor; and (iii) Milford will operate and maintain the systems installed by Key, after Key turns them over to Milford.
In March 2001, Milford annexed the West Shores development ("West Shores"), which is adjacent to Hearthstone Manor, into the City's municipal boundaries. In December 2002, Milford approved the Hearthstone Manor development plan. The plan's notes (the "Notes") state that Milford will provide sewer services to West Shores through easements located between lots 236 & 237 and Todd Courtparcels located in Hearthstone Manor. The Notes further state that Milford will not use any easements located in any additional phases of Hearthstone Manor until those phases are completed, and also that Key may relocate easements, subject to Milford's approval.
In April 2005, Milford approved the West Shores Development Plan, which provided for two sewer easements that would be located between Hearthstone Manor and West Shores. By that time, Key had installed sewer lines within Hearthstone Manor, but not up to the connection points with West Shores. Key left a gap of approximately 1,500 feet.
In June 2005, DLM, LLC ("DLM")West Shore's developersued Milford, Key and others, seeking relief from Milford's refusal to allow DLM to use Milford's easements to connect to the sewer line earlier installed in Hearthstone Manor.[2] In September 2005, DLM and Milford entered into a utility agreement which provided that DLM will be responsible for the cost of extending the sewer lines through Hearthstone Manor to West Shores. In that agreement, Milford represented that it had all the necessary easements to enable the sewer line construction to go forward.
In October 2005, DLM and Milford executed a settlement agreement in which Milford agreed to take all action required to enable the City and DLM to use the easements in Hearthstone Manor. Key was not a party to that settlement agreement.

B. The Condemnation Actions
Key refused to allow DLM access to the Hearthstone Manor easements. Consequently, in March 2006, Milford filed a condemnation action against Key to obtain easements enabling DLM to construct a sewer line up to West Shores as provided in the 2005 utility and settlement agreements. The Superior Court dismissed the action on the ground that the City Council vote to file the condemnation action did not satisfy the procedural requirements of Milford's Charter.[3]
In July 2007, after another Council vote, Milford filed a second condemnation action against Key. Milford's Council authorized the filing of that action by motion dated October 22, 2007.[4] Key moved to dismiss the second action, arguing, inter alia, that: (1) the Council's motion authorizing the filing of that action violated Milford's charter; (2) the condemnation was not for a public use; (3) Milford was equitably estopped from exercising its condemnation power against Key; and (4) Milford did not comply with the RPAA before filing the second condemnation action. On December 31, 2008, the Superior Court denied Key's motion to dismiss and granted Milford an Order of Possession.[5] On April 23, 2009, at Key's request, the Superior Court entered a Final Award of Compensation Order, ordering Milford to pay Key $5,900 as just compensation for the easements.[6] This appeal followed.

ANALYSIS
On appeal, Key claims that the Superior Court erred in denying Key's motion to dismiss the second condemnation action. As a consequence, Key argues, this Court should reverse the Superior Court's Award Order, as well as that Court's Order of Possession.[7]
We review the Superior Court's legal determinations de novo.[8] Factual findings, however, will not be disturbed if they are sufficiently supported by the record and are the product of an orderly and logical reasoning process.[9]

The Motion to File the Condemnation Action Did Not Violate the City Charter
Key first claims that Milford's condemnation violated its Charter, because the City Council authorized the filing of the condemnation action by motion, rather than by ordinance or resolution. Section 4.11 of Milford's Charter specifies eight acts by the City Council that must be accomplished by way of ordinance. The filing of a condemnation action is not included among those acts. Section 4.11 further provides that any other acts "may be done either by ordinance or by resolution." Key argues that because Section 4.11 makes no reference to Council action "by motion," the Council lacks authority to authorize the filing of a condemnation action by motion, rather than by ordinance or resolution. Therefore, the Council's vote to authorize the condemnation "by motion" violated the Charter and was void.[10]
The Superior Court rejected this argument, holding that the terms "motion" and "resolution" are synonymous. We agree that the Council acting by motion did not violate the City Charter, but decline to adopt the Superior Court's holding that the terms "motion" and "resolution" are, for all purposes, synonymous.
Although "it has been said that in substance there is no difference between a resolution and an informal motion made and carried,"[11] there is a difference in form between a "motion" and a "resolution."[12] Substantively, both are actions of the municipal body, usually adopted by vote.[13] But, a resolution is documented in a particular form, which includes "resolving clauses"each identifying specific action authorized by the voting body. A vote by motion, in contrast, does not take the form of a resolution. That formalistic difference is of no consequence in this particular case, however, because the minutes of the City Council's October 22, 2007 meeting clearly show that the decision to proceed with the condemnation action was adopted by unanimous vote.[14] Key has not shown that the City Council violated any positive provision of the Charter by documenting its decision to take action as a "motion," rather than a resolution. Although the City Charter does not specifically identify motions as a method by which the Council may vote to file a condemnation action, it also does not prohibit motions or require that an ordinance be adopted for that purpose.[15] Further, Key has failed to identify any public policy that would be offended, or to establish that it suffered any prejudice, from the styling of the Council's action to file the condemnation action as a "motion" as distinguished from a resolution.

The Condemnation Was For a Proper Purpose
Key next claims that the condemnation was merely a pretext for Milford to benefit a private partyDLMand not for a public purpose. Therefore, the condemnation violates the Public Use Clauses of both the Delaware and the U.S. Constitutions, and is invalid.[16] The Superior Court rejected that claim, holding that "the whole point of the settlement [agreement] and the condemnation action [was] merely to do what Milford always planned to do"i.e., to provide sewer service to West Shores, which serves a public purpose. We agree.
A "taking which results in a substantial benefit to private interests may nevertheless be for `public use' as required by the State and Federal constitutions," where the "underlying purpose" of the condemning authority, as well as the project itself, serve a public purpose.[17] Here, Key argues, the City's true purpose was to comply with the settlement agreement, and avoid further litigation, with DLM. But the Superior Court found the contrary. It found that that litigation, and the resulting settlement, were ultimately all about providing sewage services to Milford's residents, an unquestionably public purpose.[18] The provision of those services was Milford's primary motivation in filing the condemnation action. Any alleged private benefit to DLM arising from the condemnation (e.g., lower costs of installing sewage infrastructure in West Shores) was incidental to that primary and legitimate purpose of the condemnation.[19] Because that finding by the Superior Court is supported by sufficient evidence and is the product of logical reasoning process we uphold it.[20]

The City Was Not Estopped From Exercising its Condemnation Power
Key's third claim is that the City was equitably estopped from condemning the Hearthstone Manor easements, because both the Key utility agreement and the Notes imply a promise by the City that it would not use its condemnation power against Key. "The doctrine of equitable estoppel may be invoked when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment."[21] To establish estoppel Key must show that: (1) it lacked knowledge or the means of obtaining knowledge that the City might condemn the Hearthstone Manor easements; (2) it relied on the City's promise, implicit in the Key utility agreement and the Notes, that the City will not condemn the easements; and (3) Key suffered a prejudicial change of position as a result of that reliance.[22]
The Superior Court correctly concluded that Key had not satisfied those requirements, because Milford never promised to Key, explicitly or implicitly, that it would not condemn easements on Key's property.[23] We agree that no such promise can be implied from the utility agreement and the Notes. The utility agreement merely expresses the general principles governing the installation and maintenance of sewage and water systems in and up to Hearthstone Manor. The Notes allow Key to relocate easements intended to provide sewer services to West Shores, but only subject to Milford's approval. Stated differently, the Notes preserve Milford's ultimate power to determine the location of the easements and, if necessary, to condemn those easements. Therefore, Key's equitable estoppel claim fails for lack of any factual basis.

Compliance With the RPAA Would Be Futile
Key's final argument on appeal is that the Superior Court erred by finding that Milford was excused from complying with requirements of the RPAA before filing the condemnation action.
The RPAA applies to the acquisition of real property by state and local land acquisition programs, and seeks "to encourage and expedite real property acquisitions by agreements with owners, to assure consistent treatment of property owners, to promote public confidence in land acquisition practices, and to avoid litigation and thereby relieve congestion in the courts."[24] To achieve those purposes, the RPAA prescribes certain procedures that municipalities must follow before acquiring interests in real property by condemnation. These include: (1) making every reasonable effort to acquire the real property by negotiation;[25] (2) appraising the property before the initiation of negotiation and granting the owner's designated representatives an opportunity to accompany the appraiser during the inspection of the property;[26] and (3) providing the owner of the property with a written statement of the amount established as just compensation.[27] The Superior Court held that although Milford had failed to comply with those requirements, its failure was excused because the City showed that compliance would have been futile.[28]
Key claims that the conclusion that compliance would have been futile is unsupported by the record, because there is no evidence that the City attempted, or that Key refused, to negotiate the sale of the easements. This claim is belied by Key's request that this Court reverse both the Superior Court's Award Order and the Order of Possession.[29] Key's discontent is not with the amount that it was awarded as compensation, but rather with the condemnation itself[30]a problem that full compliance with the RPAA would not have prevented. Moreover, Key concedes that after the first condemnation action was dismissed and before the second action was filed, Milford and Key engagedunsuccessfullyin extensive negotiations to resolve this matter. The current appeal underscores the reasonableness of the Superior Court's conclusion that "no amount of negotiation or compliance with the RPAA" could have resolved the stalemate that the parties reached during those negotiations.
We find no error in the Superior Court's decision to grant Milford possession of the Hearthstone Manor easements.

CONCLUSION
For the foregoing reasons, the judgments and orders of the Superior Court are affirmed.
NOTES
[1] The utility agreement was signed by MG Development Company, LLCKey's predecessor. This opinion refers to Key as the owner and developer of Hearthstone Manor at all pertinent times.
[2] The suit was filed by Trolley Square Partners, LLCDLM's predecessor. This opinion refers to DLM as owner and developer of West Shores at all pertinent times.
[3] The council had failed to comply with several specific procedural requirements set forth in the City Charter (e.g., including a general subject matter for consideration in a motion calling for an executive session of the council to vote on the condemnation action).
[4] The city council met seven times to consider the condemnation action and voted on it four times. The Superior Court held, however, that only the October 22, 2007 vote, which ratified a previous authorization, was in compliance with Milford's charter requirements.
[5] The Superior Court declined to hold a hearing on the second condemnation action because the factual issues were identical to those raised in the first action.
[6] Key appealed from the December 31, 2008 decision. We denied that appeal because Key filed the appeal before the Superior Court had entered a final award but failed to comply with Supreme Court Rule 42 on interlocutory appeals. Key Properties Group, LLC v. City of Milford, 972 A.2d 312 (Table), 2009 WL 1059105, at *1 (Del. Apr. 21, 2009).
[7] Key does not contest the amount awarded. An adjustment of the condemnation award is, however, the only remedy available to Key in this specific case. 10 Del. C. § 6112 provides a right of review in condemnation actions "from the final confirmed award ... as in the manner provided for review of any other final civil judgment of the Superior Court" (emphasis added). To challenge the actual condemnation of the easements, Key should have filed an interlocutory appeal from the order of possession. Because Key made no attempt to certify its appeal from the December 31, 2008 decision as interlocutory, our review is limited to whether the final award "is so grossly excessive as to shock the court's conscience and sense of justice, and ... the injustice is clear." Newton v. City of Rehoboth, 593 A.2d 590 (Table), 1991 WL 78489, at *1 (Del. May 1, 1991) (citing Delmarva Power & Light v. Stout, 380 A.2d 1365, 1368 (Del. 1977)). We nonetheless choose address the merits of Key's arguments challenging the condemnation itself, because the Superior Court entered the order of final award at Key's request, "without prejudice to [its] right to seek appellate review."
[8] CCS Investors LLC v. Brown, 977 A.2d 301, 320 (Del. 2009).
[9] Wilmington Parking Auth. v. 277 W. 8th St., 227 233 (Del. 1986).
[10] Key no longer disputes that the timing of the reauthorization to file the action (i.e., after the action was filed) did not violate Milford's Charter.
[11] 62 C.J.S. Municipal Corporations § 247 (2009) (emphasis added).
[12] Perkins v. Albemarle County, 198 S.E.2d 626, 628 (Va. 1973) ("The distinction between a `motion' and a `resolution' is simply stylistic; there is no substantive difference.")
[13] 56 AM. JUR. 2D Municipal Corporations § 296 (2009) ("A resolution, in effect, encompasses all actions of a municipal body other than ordinances.")
[14] Nor has any improper motive or intent on the Council's part been shown. Milford's Council repeatedly and unanimously voted to approve the condemnation. Clearly, the Council was not seeking to avoid a more burdensome procedural requirement in acting by motion.
[15] The outcome would have been different had section 4.11 of the Charter required that a decision to condemn property be made by "ordinance." In that case, the adoption of a resolution or a motion would have violated an explicit requirement of the Charter. There are fundamental differences between an "ordinance" and a "resolution." See 56 AM. JUR. 2D Municipal Corporations § 296 (2009); 62 C.J.S. Municipal Corporations § 247 (2009); 5 McQuillin Mun. Corp. § 15.8 (3d ed.). Indeed, section 4.12 of the Charter sets forth the specific form and procedures of ordinances. The Charter, however, provides no such guidance with respect to resolutions.
[16] DEL. CONST. art. I, § 8 provides that no person's property shall "be taken or applied to public use without the consent of his representatives, and without compensation being made." U.S. CONST. amend. V provides that "public property [shall not] be taken for public use, without just compensation."
[17] Wilmington Parking Auth., 521 A.2d at 231.
[18] 11 McQuillin Mun. Corp. § 32.60 (3d ed.) (noting that the power to condemn land for the construction of a sewer system has almost universally been deemed to be for a public purpose). See also Section 2.01 of Milford's Charter providing that the City shall have the power to condemn land "for the purpose of providing sites for ... sewers [and] sewage disposal."
[19] Compare Kelo v. City of New London, 545 U.S. 469, 485-86 (2005) (noting that a taking might be for a "public purpose" even where individual private parties are the "most direct beneficiaries" of the taking).
[20] See Wilmington Parking Auth., 521 A.2d at 233 (holding that the Superior Court's finding of "primary motivation" is a finding of fact, of which this Court's review is limited).
[21] Waggoner v. Laster, 581 A.2d 1127, 1136 (Del. 1990) (quoting Wilson v. Am. Ins. Co., 209 A.2d 902, 903-04 (Del. 1965)).
[22] Id.
[23] Key contends that the Superior Court erroneously analyzed Key's argument as one based on promissory (rather than equitable) estoppel. Yet the Superior Court's December 31, 2008 Letter Opinion explicitly addresses both promissory and equitable estoppel theories.
[24] City of Dover v. Cartanza, 541 A.2d 580, 582 (Del. Super. Ct. 1988).
[25] 29 Del. C. § 9505(1)
[26] 29 Del. C. § 9505(2).
[27] 29 Del. C. § 9505(3).
[28] Cartanza, 541 A.2d at 583 (holding that valid excuses to follow the RPAA include "the agency's good faith efforts to comply with the policies or a showing that compliance would have been futile.")
[29] See note 7 supra.
[30] In fact, the Superior Court entered the Final Award of Compensation Order at Key's request.